**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiff*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD CHU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BIOAMBER INC., JEAN-FRANÇOIS HUC, and MARIO SAUCIER,<br><br>Defendants. | Case No. 2:17-cv-01531-ADS-GRB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Chad Zubriski and Named Plaintiff George Deratnay ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. This Complaint is based upon the investigation conducted by and through Plaintiffs' attorneys and included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BioAmber Inc. ("BioAmber" or the

"Company"), interviews conducted with former employees of the Company, analyst reports about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired BioAmber securities from December 23, 2016 through March 16, 2017, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. BioAmber is an industrial biotechnology company that produces and sells bio-succinic acid globally to customers in a variety of chemical markets.

3. Since the facility's completion in October 2015, BioAmber has principally been producing bio-succinic acid in its facility in Sarnia, Ontario, Canada, a joint venture with Mitsui & Co., Ltd. The Sarnia facility cost approximately $140 million and accounts for substantially all of BioAmber's production.[1]

4. To operate the Sarnia facility at a profit, BioAmber must produce at or near its full capacity. Yet currently, the entire global market for bio-succinic acid is estimated to be no more than 60,000 metric tons ("MT")/year,[2] while the Sarnia facility's capacity, alone, is 30,000 MT/year. Accordingly, finding enough customers for the output of the Sarnia facility is a very challenging sales problem because BioAmber must convince customers ***to use bio-succinic acid*** before it can convince them to buy the bio-succinic acid from BioAmber.

---

[1] Unless otherwise noted, all dollar figures are in U.S. dollars. Between September 2016 and the end of the Class Period, one Canadian dollar was worth approximately $0.74-0.77.

[2] A metric ton is approximately 2,200 pounds.

5. BioAmber's sales ramp-up was slow but promising. BioAmber earned revenues of $1.1 million in Q4 2015, $1.5 million in Q1 2016, $2.5 million in Q2 2016, and $3.6 million in Q3 2016. Since BioAmber's average sales price for bio-succinic acid is $2,000/MT, BioAmber sold approximately 1,800 MT in Q3 2016 – or about a quarter of full capacity.

6. On December 23, 2016 (the "December Offering"), BioAmber announced an underwritten offering of common stock and warrants, which raised $5.6 million. The December Offering's Prospectus Supplement, filed December 23, estimated Q4 2016 revenues of between $2.0 million and $2.2 million. The Prospectus Supplement added that a customer had contracted for delivery of a further $2.8 million, but had delayed the order, which would therefore be filled in 2017.

7. On January 23, 2017 (the "January Offering"), BioAmber announced another underwritten offering of common stock and warrants, raising net proceeds of $18.6 million. The January Offering's Prospectus Supplement, filed January 25, likewise estimated Q4 2016 revenues of between $2.0 million and $2.2 million, with a further $2.8 million order to be filled in 2017.

8. Using the proceeds from the December Offering and the January Offering, BioAmber was able to retire a CDN$25 million debt facility with an onerous interest rate of prime plus 10.8%.

9. BioAmber's Q4 2016 ended on December 31, 2016. By the time the January Offering's Prospectus Supplement was filed, Q4 2016 had already been closed for more than three weeks.

10. On March 16, 2017, BioAmber announced Q4 2016 revenues of $631,000. BioAmber blamed a shipment of $1.4 million, or approximately 70% of Q4 2016 revenues, which had not shipped by the end of the quarter. On March 17, 2017, BioAmber's stock price fell by 18%

as a result. Investors, including those who purchased in BioAmber's two public offerings in December and January, suffered millions of dollars in losses as a result of Defendants' misrepresentations.

11. As of December 31, 2016, BioAmber had only 17 employees engaged in general and administrative activities. $1.4 million of bio-succinic acid at BioAmber's average sales price weighs approximately 700 MT, or 1.5 million pounds, or more than 23 tractor trailer loads of hazardous materials. Moreover, according to a former BioAmber employee, BioAmber's CFO personally controls every significant revenue recognition decision.

12. BioAmber states in its annual reports that "Revenue is recognized when persuasive evidence of an arrangement exists, the fee is determinable, collectability is reasonably assured and ***delivery has occurred***, which for product revenue is at the time of transfer of title."

13. Accordingly, Defendants plainly knew or were reckless in not knowing that the $1.4 million of bio-succinic acid had not shipped by the quarter's end. Yet by prematurely recognizing revenues on the sale, Defendants were able to avoid having to report that after four successive quarters of desperately-needed growth, revenues had fallen by more than 82% just as they were attempting to raise millions of dollars in public offerings to eliminate an onerous debt facility.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misleading statements entered this judicial district, BioAmber is a corporation subject to the Court's personal jurisdiction with respect to this action and thus resides in this district for venue purposes, and the other Defendants do not reside in the U.S.

17. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18. Lead Plaintiff, as set forth in his PSLRA certification previously filed with the Court, incorporated by reference herein, purchased BioAmber securities pursuant to the Company's offerings during the Class Period and was economically damaged thereby.

19. Named Plaintiff George Deratney as set forth in his PSLRA certification attached as an Exhibit hereto and incorporated by reference herein, purchased BioAmber securities pursuant to the Company's offerings during the Class Period and was economically damaged thereby.

20. Defendant BioAmber an industrial biotechnology company, which produces and sells bio-succinic acid to various chemical market customers in the United States. The Company is incorporated in Delaware and its principal executive offices is located in Montreal, Quebec, Canada. BioAmber's common stock is, and was during the Class Period, traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BIOA."

21. Defendant Jean-François Huc was BioAmber's Chief Executive Officer and President from 2009 through the abrupt end of his employment on February 17, 2017. Huc also

served as a Director of BioAmber from 2008 to May 12, 2017. Huc had previously served as Chief Operating Officer for Diversified Natural Products Inc. when it spun off its succinic acid assets into what became BioAmber.

22. Defendant Mario Saucier became the Company's Chief Financial Officer on January 4, 2016, holding that position until the abrupt end of his employment on March 28, 2017.

23. Defendants Huc and Saucier are collectively referred to herein as the "Individual Defendants."

24. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

25. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

26. Defendants BioAmber and the Individual Defendants are collectively referred to herein as "Defendants."

**WITNESSES**

27. Plaintiffs' investigator spoke with former BioAmber employees who have personal knowledge of the facts alleged in this Complaint.

28. Former Employee 1 ("FE 1") served as the Company's CFO from September 2011 through his retirement in December 2014, and returned to the position on an interim basis from July 2015 to January 2016.

29. Former Employee 2 ("FE 2") served as BioAmber's Global Applications and Technology Support Manager from June 2013 to April 2016.

30. Former Employee 3 ("FE 3") served as BioAmber's Vice President – Business Development from February 2012 to November 2015.

31. Former Employee 4 ("FE 4") served as BioAmber's Corporate Director of Human Resources from January 2014 through November 2016.

## DEFENDANTS' MISCONDUCT

### Background

32. BioAmber is an industrial biotechnology company that produces renewable chemicals. BioAmber converts bio-based feedstocks into renewable chemicals as cost-competitive replacements for petroleum-derived chemicals with potential for use in a wide variety of products. BioAmber sells its first product, bio-succinic acid, to customers in a variety of chemical markets, mostly through the use of multi-year agreements to supply bio-succinic acid.

33. Prior to October 2015, BioAmber produced bio-succinic acid in a small-scale demonstration facility in France. BioAmber ultimately produced less than 1600 MT at this demonstration facility over its 5 years of operation ending in late 2014.

34. In October 2015, BioAmber began commercial-scale production of bio-succinic acid at its major facility in Sarnia (the "Sarnia Facility"), in a joint venture with Mitsui in which BioAmber operated the facility and held a 60% interest.

35. The Sarnia Facility was a significant investment, with a final price tag of approximately $141.5 million. Moreover, repeated construction delays and significant cost overruns meant production started on a sour note.

36. To mollify investors, in its 2015 10-K filed March 15, 2016 (the "2015 10-K"), BioAmber announced that it expected production at the Sarnia Facility to reach full capacity of 30,000 MT/year in 2017.

37. Early BioAmber results – while they suggested BioAmber would have some difficulty in reaching its target – were generally supportive, with revenues rising from $1.1 million in Q4 2015 to $3.7 million in Q4 2016. Yet BioAmber's substantial operating costs, research and development costs, and other costs meant profitability was still far away:

*Sales revenues, cost of goods sold, and net loss by quarter*

| Quarter | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|
| Revenues | $1.1 million | $1.5 million | $2.5 million | $3.7 million |
| Cost of Goods Sold | $1.2 million | $3.1 million | $3.5 million | $5.0 million |
| Revenues Less Cost of Goods Sold | ($0.1 million) | ($1.6 million) | ($1.0 million) | ($1.3 million) |
| Net income (loss) attributable to BioAmber shareholders | ($7.8 million) | ($10.9 million) | $4.8 million[3] | ($6.2 million) |

*Source: 2015 10-K and Q1-Q3 10-Qs*

38. Meanwhile, BioAmber's cash reserves were rapidly dwindling. BioAmber had just $7 million of cash and cash equivalents as of December 31, 2015, and $5.5 million by June 30, 2016.

39. In fact, in September 2016, BioAmber entered into an agreement for a demand non-revolving credit facility with Bridging Finance, Inc., and received net loan proceeds of CAD$25 million (the "Debt Facility"), after paying a 1.5% financing fee. The Debt Facility was secured by substantially all of BioAmber's assets and was repayable at the earlier of demand or September 30, 2017. The Debt Facility also bore an onerous interest rate of 10.8% ***plus*** the Bank of Montreal

[3] This is a paper profit resulting from an $11.9 million financing gain from revaluation of unexercised warrants because of BioAmber's relatively low share price.

prime rate of approximately 2-3%, compounded monthly – meaning that BioAmber could expect to pay CDN$3-4 million per year of interest on the Debt Facility. BioAmber could hardly afford to pay this interest.

40. As of September 30, 2016, even after the infusion from the Debt Facility, BioAmber had only $16.0 million, or about nine months' worth of expenses.

41. BioAmber also was depending on the future exercise of warrants to fund its operations. In its May 2013 IPO, BioAmber had sold warrants with an exercise price of $5/share. As Huc explained in BioAmber's Q3 2016 earnings conference call, BioAmber was considering lowering the exercise price or extending the life of the warrants, for no consideration, to ensure they were exercised and that BioAmber received the proceeds. That BioAmber was willing to consider simply giving valuable consideration to warrant-holders as a gift showed its desperation.

42. Thus, while BioAmber's revenue growth showed some promise, time was not on its side.

**BioAmber's fortunes take a sharp turn for the worse just as it needs to raise cash**

43. In Q4 2016, BioAmber's fortunes took a sharp turn for the worse.

44. First, a large BioAmber customer was expected to purchase $2.8 million of bio-succinic acid in Q4 2016, but due to a technical problem in the customer's manufacturing facility postponed the order to 2017.

45. Second, a $1.4 million order was not completed as planned in Q4 2016. On the Q1 2017 earnings call, following the Class Period, in response to a question from Rodman & Renshaw analyst Sameer Joshi, Michael Hartmann, BioAmber's CEO, explained that this $1.4 million related to an order which was not shipped in Q4 2016.

46. As a result, BioAmber's Q4 2016 revenues were a mere $631,000 – an approximately 82% collapse from Q3 2016 revenues $1.4 million, or 68% less than expected.

47. With its dire need for cash, BioAmber faced the daunting task of raising money in the face of an 82% collapse in revenues.

**Defendants' false and misleading Class Period statements**

48. BioAmber's 2015 and 2016 10-Ks both state that BioAmber's revenue recognition policy is that "[r]evenue is recognized when persuasive evidence of an arrangement exists, the fee is determinable, collectability is reasonably assured ***and delivery has occurred***, which for product revenue is at the time of transfer of title" (emphasis added).

49. Similarly, Generally Accepted Accounting Principles ("GAAP") provide that revenues can only be recognized when the buyer takes title at delivery. FASB Concepts Statement 5, paragraph 84(a), (b), and (d).

50. On December 23, 2016, the Company announced an underwritten offering of approximately 1.7 million shares of its common stock at $4.00 per share, with gross proceeds approximately $7 million and net proceeds to BioAmber of approximately $5.6 million. The Company also announced a registered direct offering to "permitted investors" in Canada of warrants to purchase a total of approximately 2.2 million shares of common stock, anticipating gross proceeds of approximately $8.9 million[4] (together with the stock offering, the "December Offering").

51. The December Offering was made by the Company pursuant to a shelf registration statement on Form S-3 that was previously filed with the SEC, a related registration statement on

[4] The warrants would be automatically exercised for no consideration if BioAmber obtained a listing on the Toronto Stock Exchange on or before 120 days after the date of issuance of the warrants. If BioAmber did not obtain a listing, the proceeds would revert to warrant purchasers.

Form S-3MEF which became effective upon filing with the SEC on December 22, 2016 (the "2016 Registration Statement"), and two Prospectus Supplements filed with the SEC on December 23, 2016 (the "December Prospectus Supplements"). The 2016 Registration Statement was signed by Defendants Huc and Saucier, and incorporated by reference the December Prospectus Supplements.[5]

52. The December Prospectus Supplements each contained the following statements regarding the Company's operating results:

> **Recent Operating Results (Preliminary and Unaudited)**
>
> ***For the three months and year ended December 31, 2016, we expect total revenues to be between $2.0 million and $2.2 million, and $9.6 million and $9.8 million, respectively***, as compared to total revenues of $1.1 million and $2.2 million for the three months and year ended December 31, 2015, and $3.7 million for the three months ended September 30, 2016.

53. On January 23, 2017, the Company commenced another offering (the "January Offering") for the sale of approximately 2.1 million shares of its common stock at $4.75 per share, together with warrants to purchase a minimum of 1,052,632 shares of common stock of the Company with an exercise price of US$5.50 per share of common stock, with expected gross proceeds to the Company of $10 million (assuming no exercise of the warrants).

---

[5] The 2016 Registration Statement "incorporates by reference the contents of, including all amendments and exhibits thereto and all information incorporated by reference therein, the Registration Statement on Form S-3 (Registration No. 333-196470) (the 'Prior Registration Statement'), which was declared effective by the Commission on July 9, 2014." The Prior Registration Statement in turn incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated." Thus the December Prospectus Supplements are incorporated by reference into the 2016 Registration Statement.

54. On January 24, 2017, the Company announced an increase of the January Offering to $17.5 million.

55. The January Offering was made by the Company pursuant to a shelf registration statement on Form S-3 that was filed with the SEC on January 3, 2017, and declared effective by the SEC on January 12, 2017 (the "January Registration Statement"), as well as Prospectus Supplements filed on January 23, 2017 and January 24, 2017 (the "January Prospectus Supplements"). The January Registration Statement was signed by Defendants Huc and Saucier, and incorporated by reference the January Prospectus Supplements.[6]

56. The January Prospectus Supplements stated the following with regards to the Company's operating results:

> **Recent Operating Results (Preliminary and Unaudited)**
>
> ***For the three months and year ended December 31, 2016, we expect total revenues to be between $2.0 million and $2.2 million, and $9.6 million and $9.8 million***, respectively, as compared to total revenues of $1.1 million and $2.2 million for the three months and year ended December 31, 2015, and $3.7 million for the three months ended September 30, 2016.

57. The statements contained in ¶¶52 & 56 were materially false and misleading because they overstated BioAmber's revenues by nearly 70%. Because the $1.4 million order had not shipped, pursuant to its revenue recognition policy and GAAP, BioAmber could not recognize revenues from the $1.4 million order in Q4 2016. Accordingly, BioAmber's Q4 2016 revenues were not $2.0-2.2 million, but $0.6 million.

**Subsequent developments**

[6] The January Registration Statement incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated."

58. On January 27, 2017, using the proceeds from the December and January Offerings, BioAmber retired the Debt Facility.

59. In a February 17, 2017 public announcement, BioAmber claimed that its Board of Directors and Defendant Huc "mutually agreed that Mr. Huc would cease serving in his roles as Chief Executive Officer and President of the Company", effective immediately. Huc was replaced by an Acting CEO, and BioAmber then began a search for a permanent CEO.

60. In a March 28, 2017 public announcement, BioAmber claimed that its Board of Directors and Saucier "mutually agreed that Mr. Saucier would cease serving in his role as Chief Financial Officer of the Company", effective immediately. Saucier was replaced by an Acting CFO, and BioAmber then began a search for a permanent CFO.

61. On August 1, 2017, BioAmber purchased Mitsui's interest in the Sarnia Facility for $1.

**Additional facts further probative of scienter**

62. Further facts, in addition to those set out above, show that the statements were made with scienter.

63. As of December 31, 2016, BioAmber had only 86 full-time employees, of whom only 17 were engaged in general and administrative activities. Accordingly, only a few BioAmber employees were involved in revenue recognition.

64. According to FE 1, in his experience, the role of a CFO at BioAmber "was the ultimate accounting officer. Obviously, decisions or recommendations were discussed among the senior management team." FE 1 stated that the CFO of the Company would certainly be involved with all major revenue recognition decisions, with input from the CEO. Defendant Huc was CEO

at the time FE 1 served as CFO and at the time BioAmber released its supplemental prospectuses in connection with the offerings.

65. FE 1 reported a delay of a major shipment would definitely be reported to the CEO and other senior executives at the Company.

66. According to FE 3, Huc and other top executives were intimately involved in day-to-day operations, as well as making accounting decisions. "We were a small company, so of course they went up to him," FE 3 said. And, according to FE 3, Huc worked very closely with then-COO Fabrice Orecchioni on day-to-day operational issues.

67. Indeed, according to FE 4, a "very close circle" of senior management participated in senior-level discussion and were responsible for all major discussion.

68. And according to FE 3, BioAmber was "meticulous" about documenting client communications and issues. According to FE 3, because BioAmber documented every client interaction, "I know we knew if something was going to be delayed."

69. BioAmber's average sales price of bio-succinic acid hovered around $2,000 per metric ton. In a press release dated March 14, 2016, the Company described its average selling price in reference to a "$2,000 / MT guidance." During an earnings call on November 3, 2016, an analyst asked, "in terms of the bio-succinic acid sale price, is $2,000 per tonne [metric ton] fair?" Huc responded, "We have not seen a material change in our average selling price in 2016 year to date. And so we're not giving any change relative to past guidance." And on an earnings call taking place August 3, 2016, an analyst again asked whether BioAmber's average selling price

continued to be $2,000/MT; BioAmber's acting CEO answered that BioAmber's average selling price had continued to remain steady.[7]

70. Based on this average selling price, a $1.4 million order for bio-succinic acid would weigh approximately 700 MT. In the U.S., a tractor trailer rig cannot weigh more than 31 metric tons, meaning that the 700 MT would account for more than 23 tractor trailer loads. Moreover, given that 1 MT of bio-succinic acid occupies 55.1 cubic feet of space, 700 MT of bio-succinic acid would occupy a volume of approximately 15,821 cubic feet. And bio-succinic acid is a hazardous corrosive substance that causes serious eye damage, is harmful if it touches the skin, requires gloves and facial protection for handling, and requires special precautions in shipping such as not reusing containers. Shipping this massive quantity of a hazardous product was no small feat and required significant oversight, planning, personnel and time to arrange, especially at a small company like BioAmber. Moreover, the $1.4 million shipment represented 70% of the Company's expected revenues for the entire quarter, at a time when the Company was trying hard to ramp up production and sales in order to offset significant capital expenditures. BioAmber's upper management was necessarily involved with the shipment and updated on any developments or delays. Accordingly, BioAmber's senior management, including the Individual Defendants, knew that the shipment was delayed.

71. BioAmber has admitted that its premature recognition of the $1.4 million in revenue resulted from a material weakness in its internal controls, stating in its 2016 10-K that:[8]

> In connection with the preparation of our year ended December 31, 2016 consolidated financial statements, we identified a material weakness in internal control over financial reporting, that if not corrected, could result in a material misstatement in our financial

---

[7] FE 2 also noted that BioAmber's average selling price was approximately $1/pound, or $2,200/MT.

[8] BioAmber's Q3 2016 10-Q did not report this material weakness in internal controls, meaning that the material weakness arose in the fourth quarter of 2016.

> statements. ***The material weakness is related to accounting for non-routine or complex transactions, which resulted in an error in the accounting treatment in a complex revenue recognition transaction and in an inadequate financial statements disclosure.*** Our review process for the accounting treatment for non-routine or complex transactions allowed these errors to go undetected, and management has assessed the potential magnitude and concluded that this represents a material weakness in our internal control over financial reporting[.]

(emphasis added).

**Loss causation**

72. On March 16, 2017, the Company issued a press release after close of trading announcing disappointing financial results for the 2016 fiscal year, noting that "[o]ur fourth quarter 2016 product sales of approximately $631,000 were below our previously disclosed fourth quarter expectations of $2.0 to $2.2 million. We expected that additional revenue of approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017 and was classified as a deferred revenue as of December 31, 2016."

73. The same day, the Company filed its 2016 10-K, stating that "Our sales for the three months ended December 31, 2016 of approximately $631,000 were below our expectations. We expected that additional revenue of approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017, and recorded as deferred revenue on our consolidated balance sheets as of December 31, 2016."

74. On this news, shares of BioAmber fell $0.59 per share, or over 18%, from their previous closing price on unusually high volume to close at $2.55 per share on March 17, 2017, damaging investors.

75. Analysts were surprised by the news:

a. A March 17, 2017 report by an analyst employed by AltaCorp Capital commented that "Q4 product sales of $0.6 million were much lower than our expectations of $2.1 million."

b. A March 17, 2017 report by an analyst employed by Rodman & Renshaw commented that "[r]evenues came in lower than expected."

c. Barclays discontinued coverage of BioAmber in an April 21, 2017 report that cited the revenue shortfall and the associated material deficiency in internal controls.

d. Canaccord Genuity similarly discontinued coverage on March 17, 2017, the day after BioAmber announced its Q4 2016 results.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

76. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired BioAmber securities publicly traded during the Class Period and/or pursuant and/or traceable to the Offerings, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

77. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BioAmber securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

78. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

80. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the Exchange Act was violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public misrepresented material facts about the Company’s financial condition and business;

c. whether Defendants' public statements to the investing public omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Defendants caused the Company to issue false and misleading SEC filings;

e. whether Defendants acted knowingly or recklessly in issuing false and SEC filing;

f. whether the prices of BioAmber securities were artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82. In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market theory, because BioAmber's common stock traded in an efficient market during the Class Period, as follows:

a. Throughout the Class Period, BioAmber's common stock shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market, throughout the Class Period. BioAmber shares were highly liquid during the Class Period;

b. As a regulated issuer, BioAmber filed periodic public reports with the SEC and the NYSE;

c. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d. The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of BioAmber's shares;

e. BioAmber's securities were covered by at least 4 securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, including AltaCorp Capital, Barclays, Rodman & Renshaw, and Canaccord Genuity, and these reports were distributed to the sales force and certain customers

of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f. On average, approximately 1.3 million BioAmber shares, or 3.8% of BioAmber's total shares outstanding and 5.2% of its float, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

g. As an NYSE-traded stock, BioAmber had a designated market maker which made a market in BioAmber's shares.

h. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of BioAmber's shares.

83. Based on the foregoing, the market for BioAmber securities promptly digested current information regarding BioAmber from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## **COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

85. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

86. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BioAmber securities during the Class Period.

89. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiffs and the Class.

91. As a result of the foregoing, the market price of BioAmber securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of BioAmber securities during the Class Period in purchasing BioAmber securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92. Had Plaintiffs and the other members of the Class been aware that the market price of BioAmber securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased BioAmber securities at the artificially inflated prices that they did, or at all.

93. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

94. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of BioAmber securities during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

95. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

97. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BioAmber securities.

99. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 7, 2017

Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Jonathan Horne
Jonathan Horne, Esq. (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com

**GOLDBERG LAW PC**
Michael Goldberg, Esq.
1999 Avenue of the Stars
Suite 1100
Los Angeles CA 90067
Phone: 1800-977-7401
Fax: 1800-536-0065

*Co-Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2017, I electronically filed the foregoing document, which sent notification of such filing to all counsel of record.

/s/ Jonathan Horne

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against BioAmber Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The BioAmber Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** george
**Middle initial:** g
**Last name:** deratnay
**Address:** REDACTED [redacted]
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 01/23/2017 | 500 | 5.26 |
| Common Stock | 01/25/2017 | 500 | 4.29 |
| Common Stock | 02/03/2017 | 1000 | 3.82 |
| Common Stock | 02/07/2017 | 1000 | 3.56 |

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

**Certification for george deratnay (cont.)**

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 03/19/2017

