# EXHIBIT

# B

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
       lrosen@rosenlegal.com
       pkim@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiff*

[Additional counsel on signature page]

<div align="center">

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| ~~DONALD CHU~~CHAD ZUBRISKI and GEORGE DERATNAY, Individually and on Behalf of All Others Similarly Situated, <br><br> ~~Plaintiff~~Plaintiffs, <br><br> vs. <br><br> BIOAMBER INC., JEAN-FRANÇOIS HUC, and MARIO SAUCIER, <br><br> Defendants. | Case No. 2:17-cv-01531-ADS-GRB <br><br> **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

Lead Plaintiff Chad Zubriski and Named Plaintiff George Deratnay ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. This Complaint is based upon the investigation conducted by and through Plaintiffs' attorneys and included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding BioAmber Inc. ("BioAmber" or the "Company"), interviews conducted with former employees of the Company, analyst reports about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired BioAmber securities from ~~December 23, 2016~~July 15, 2014 through ~~March 16~~August 3, 2017, both dates inclusive (the "Class Period"), and were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      BioAmber is an industrial biotechnology company that produces and sells bio-succinic acid globally to customers in a variety of chemical markets.

~~Since the facility's completion in October 2015,~~ **BioAmber** ~~has principally been producing bio-succinic acid in~~ **jilts its** ~~facility in Sarnia, Ontario, Canada,~~**joint venture partner and hides material facts from investors because "the SEC doesn't care about" fraud committed by "small companies" like BioAmber**

3.      The completion of BioAmber's first, and so far only, commercial-scale facility in October 2015 was an event three years in the making. In order to help construct it, BioAmber entered into a joint venture with Mitsui & Co., Ltd.~~ The Sarnia ~~., a massive Japanese company with $40 billion in annual revenues. The facility, located in Sarnia, Canada (the "Sarnia Facility") and operated as a joint venture with Mitsui, cost ~~approximately~~more than $140 million ~~and accounts for substantially all of BioAmber's~~.

2

3.4.    To help sell the Sarnia Facility's production.[‡]—, in July 2014 – more than one year before the facility was even completed – BioAmber entered into, and publicly touted, an agreement to sell fully one third of its production to a chemical broker, Vinmar International Ltd. BioAmber boasted that pursuant to the agreement, Vinmar was required to pay for the Sarnia Facility's bio-succinic acid even if it could not find any buyers for it and had no use for it itself. The Company anticipated that some combination of Mitsui's world-class sales network in Asia and BioAmber's own sales effort would sell the remainder of the Sarnia Facility's production. Since 95% of the market for succinic acid is in China, Mitsui would be of paramount importance.

5.    But, unbeknownst to investors and to Mitsui itself, BioAmber's agreement with Vinmar undercut that assumption, because it made Vinmar BioAmber's exclusive broker of bio-succinic acid for all of Asia. Mitsui was unaware of the provision as late as November 2014.

6.    Defendant Huc personally negotiated the Vinmar agreement. When a senior BioAmber executive expressed concern, Huc stated that cutting Mitsui out was no loss in his view because "you can't trust" Japanese businesspeople.

7.    When Mitsui discovered that it had been cut out of its own market by its joint venture partner, Mitsui was frustrated, insulted, and aghast. Mitsui stopped speaking directly to Huc, instead using a senior BioAmber executive as an intermediary.

8.    Both Mitsui and BioAmber executives were concerned that Vinmar was not capable of selling large quantities of bio-succinic acid, a specialty chemical which Vinmar otherwise does not sell, and particularly not in China. By 2015, it was clear that their concerns had proven accurate. In a meeting taking place in May or June 2015, Vinmar admitted that it

---

[‡] Unless otherwise noted, all dollar figures are in U.S. dollars. Between September 2016 and the end of the Class Period, one Canadian dollar was worth approximately $0.74 0.77.

would be unable to sell the 10,000 metric tons of bio-succinic acid it was obligated to buy in 2016.

9. In July 2015, Huc announced to a senior BioAmber leadership meeting that he had released Vinmar from all its obligations under the agreement for 2015 and 2016. Huc added that BioAmber would not be disclosing that it had released Vinmar to investors.

10. An ashen senior BioAmber executive asked Huc how he could possibly justify lying to investors in this way. Huc answered that the lies were:

> ***Not a problem. The SEC doesn't care about stuff like that. We're too small [of a company].***

11. Huc also instructed the senior executive not to disclose the release to BioAmber's Board of Directors before the next meeting.

12. When Mitsui found out that Huc had released Vinmar, Mitsui was frustrated and insulted. It conveyed its frustration to the senior BioAmber executive who served as their liaison, who then conveyed it to Huc.

13. Defendants never disclosed to investors that BioAmber had released Vinmar from its obligations. Instead, in February 2016, they claimed that Mitsui had agreed to market bio-succinic acid in Asia, and in December 2016, claimed that Mitsui had advised BioAmber of channel conflicts between it and Vinmar.

**A Q4 2016 collapse in revenues leaves BioAmber in a precarious position**

~~4.~~14. To operate the Sarnia facility at a profit, BioAmber must produce at or near its full capacity. Yet currently, the entire global market for bio-succinic acid is estimated to be no more than 60,000 metric tons ("MT")/year,~~[2]~~ with each MT approximately 2,200 pounds, while

~~[2] A metric ton is approximately 2,200 pounds.~~

the Sarnia facility's capacity, alone, is 30,000 MT/year. Accordingly, finding enough customers for the output of the Sarnia facility is a very challenging sales problem because BioAmber must convince customers *to use bio-succinic acid* before it can convince them to buy the bio-succinic acid from BioAmber.

~~5.~~15.    BioAmber's sales ramp-up was slow but promising. BioAmber earned revenues of $1.1 million in Q4 2015, $1.5 million in Q1 2016, $2.5 million in Q2 2016, and $3.6 million in Q3 2016. Since BioAmber's average sales price for bio-succinic acid is $2,000/MT, BioAmber sold approximately 1,800 MT in Q3 2016 – or about a quarter of full capacity.

16.    In December 2016, BioAmber entered into a relationship with CJ CheilJedang Corporation ("CJCJ"), a Korean biotechnology company, to form a joint venture to retrofit a plant owned by CJCJ in China to start manufacturing succinic acid in China. As part of that deal, CJCJ placed an order with BioAmber for 1,000 metric tons of bio-succinic acid, worth approximately $1.4 million (the "CJCJ Order").

17.    The CJCJ Order was confirmed in early December 2016, and the Company scrambled to fill the order by year end in order to recognize the sale in its Q4 2016 financials.

18.    BioAmber, through Defendant Saucier, determined contemporaneously that it could not recognize revenues on the CJCJ Order until the order was actually received by CJCJ, in Korea. Indeed, BioAmber states in its annual reports that "Revenue is recognized when persuasive evidence of an arrangement exists, the fee is determinable, collectability is reasonably assured and *delivery has occurred*, which for product revenue is at the time of transfer of title."

19.    But the order was not delivered in 2016, and in fact did not even ship from the Sarnia Facility until early January to mid-February 2017.

20.     BioAmber's management, including Huc, Saucier, and its COO, received regular reports on the status of each order shipment, including the CJCJ Order, and the Company kept a running log of how much product had been shipped to date.

6.21.   On December 23, 2016 (the "December Offering"), BioAmber announced an underwritten offering of common stock and warrants, which raised $5.6 million. The December Offering's Prospectus Supplement, filed December 23, estimated Q4 2016 revenues of between $2.0 million and $2.2 million. The Prospectus Supplement added that a customer had contracted for delivery of a further $2.8 million, but had delayed the order, which would therefore be filled in 2017.

7.22.   On January 23, 2017 (the "January Offering"), BioAmber announced another underwritten offering of common stock and warrants, raising net proceeds of $18.6 million. The January Offering's Prospectus Supplement, filed January 25, likewise estimated Q4 2016 revenues of between $2.0 million and $2.2 million, with a further $2.8 million order to be filled in 2017.

8.23.   Using the proceeds from the December Offering and the January Offering, BioAmber was able to retire a CDN$25 million debt facility with an onerous interest rate of prime plus 10.8%.

9.24.   BioAmber's Q4 2016 ended on December 31, 2016. By the time the January Offering's Prospectus Supplement was filed, Q4 2016 had already been closed for more than three weeks.

10.25.  On March 16, 2017, BioAmber announced Q4 2016 revenues of $631,000. BioAmber blamed a shipment of $1.4 million, or approximately 70% of Q4 2016 revenues, which had not shipped by the end of the quarter. On March 17, 2017, BioAmber's stock price

fell by 18% as a result. ~~Investors, including those who purchased in BioAmber's two public offerings in December and January, suffered millions of dollars in losses as a result of Defendants' misrepresentations.

11.    As of December 31, 2016, BioAmber had only 17 employees engaged in general and administrative activities. $1.4 million of bio succinic acid at BioAmber's average sales price weighs approximately 700 MT, or 1.5 million pounds, or more than 23 tractor trailer loads of hazardous materials. Moreover, according to a former BioAmber employee, BioAmber's CFO personally controls every significant revenue recognition decision.

12.    BioAmber states in its annual reports that "Revenue is recognized when persuasive evidence of an arrangement exists, the fee is determinable, collectability is reasonably assured and **_delivery has occurred_**, which for product revenue is at the time of transfer of title."

13.26.    Accordingly, Defendants plainly knew ~~or were reckless in not knowing that the $1.4 million of bio succinic acid~~that the CJCJ Order had not shipped by the quarter's end, and that BioAmber could not recognize revenues for the CJCJ Order that quarter. Yet by prematurely recognizing revenues on the sale, Defendants were able to avoid having to report that after four successive quarters of desperately-needed growth, revenues had fallen by more than 82% just as they were attempting to raise millions of dollars in public offerings to eliminate an onerous debt facility.

27.    BioAmber used the proceeds from the December and January Offerings to fund a lavish payoff to Defendant Huc of 170% of his annual salary, and a lucrative consulting contract paying him the equivalent of $4,000 a day, when he left BioAmber's employ in February 2017.

28.     By mid-2017, Mitsui decided that it had had enough. It sold its investment in BioAmber back to BioAmber for CDN$1. In response to Mitsui's vote of no confidence, BioAmber's stock price fell by 56% over two trading days.

## JURISDICTION AND VENUE

~~14.~~29.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

~~15.~~30.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

~~16.~~31.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misleading statements entered this judicial district, BioAmber is a corporation subject to the Court's personal jurisdiction with respect to this action and thus resides in this district for venue purposes, and the other Defendants do not reside in the U.S.

~~17.~~32.  In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

~~18.~~33.  Lead Plaintiff, as set forth in his PSLRA certification previously filed with the Court, incorporated by reference herein, purchased BioAmber securities ~~pursuant to the Company's offerings~~ during the Class Period and was economically damaged thereby.

~~19.~~34.  Named Plaintiff George Deratney as set forth in his PSLRA certification ~~attached as an Exhibit hereto and~~previously filed with the Court, incorporated by reference herein, purchased BioAmber securities ~~pursuant to the Company's offerings~~ during the Class Period and was economically damaged thereby.

~~20.~~35.  Defendant BioAmber is an industrial biotechnology company~~,~~ which produces and sells bio-succinic acid to various chemical market customers in Canada and the United States. Bio-succinic acid is a bulk industrial product used in plastics, food additives, personal care products, as well as other industrial chemicals. The Company is incorporated in Delaware and its principal executive offices is located in Montreal, ~~Quebec,~~ Canada. BioAmber's common stock is, and was during the Class Period, traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BIOA."

~~21.~~36.  Defendant Jean-François Huc was BioAmber's Chief Executive Officer and President from 2009 through the abrupt end of his employment on February 17, 2017. Huc also served as a Director of BioAmber from 2008 to May 12, 2017.  Huc had previously served as Chief Operating Officer for Diversified Natural Products Inc. when it spun off its succinic acid assets into what became BioAmber.

~~22.~~37.  Defendant Mario Saucier became the Company's Chief Financial Officer on January 4, 2016, holding that position until the abrupt end of his employment on March 28, 2017.

~~23.~~38.  Defendants Huc and Saucier are collectively referred to herein as the "Individual Defendants."

~~24.~~39.  The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

~~25.~~40.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

~~26.~~41.  Defendants BioAmber and the Individual Defendants are collectively referred to herein as "Defendants."

## WITNESSES

~~27.~~42.  Plaintiffs' investigator spoke with former BioAmber employees who have personal knowledge of the facts alleged in this Complaint.

~~28.~~43.  Former Employee 1 ("FE 1") served as the Company's CFO from September 2011 through his retirement in December 2014, and returned to the position on an interim basis from July 2015 to January 2016.

~~29.~~  Former Employee 2 ("FE 2") served as BioAmber's ~~Global Applications and Technology Support Manager from June 2013 to April 2016.~~

~~30.~~44.  ~~Former Employee 3 ("FE 3") served as BioAmber's~~ Vice President – Business Development from February 2012 to November 2015.

~~31.~~45.  Former Employee 4~~3~~ ("FE 4~~3~~") served as BioAmber's Corporate Director of Human Resources from January 2014 through November 2016.

46.  Former Employee 4 ("FE 4") served as BioAmber's Senior Vice President – Sales from November 2014 to October 2015. FE 4 has nearly 30 years' experience in the chemical industry at a well-known, reputable, international conglomerate. Huc and BioAmber Executive Vice President Mike Hartmann interviewed FE 4 in Manhattan. FE 4 was part of BioAmber's

senior leadership team alongside Huc, then-COO Fabrice Orechionni, then-Chief Commercial Officer Babette Petterson, Chief Technology Officer Jim Millis, Hartmann, then-CFO Francois Lauren, and Laurent Bernier, a co-founder. FE 4 was invited to substantially all senior management meetings.

47.     Former Employee 5 ("FE 5") served as BioAmber's Supply Chain Director at the Sarnia Facility from September 2014 to July 2017. FE 5 built BioAmber's supply chain from scratch. FE 5's job responsibilities included notifying BioAmber's management of the status of each shipment from the Sarnia Facility.

## CURRENCY

48.     Unless otherwise noted, all dollar figures are in U.S. dollars. Between the beginning and the end of the Class Period, one Canadian dollar was worth approximately $0.69-0.94.

## DEFENDANTS' MISCONDUCT

### Background

32.49.  BioAmber is an industrial biotechnology company that produces renewable chemicals.  BioAmber converts bio-based feedstocks into renewable chemicals as cost-competitive replacements for petroleum-derived chemicals with potential for use in a wide variety of products.  BioAmber sells its first product, bio-succinic acid, to customers in a variety of chemical markets, mostly through the use of multi-year supply agreements to supply bio-succinic acid.

50.     Bio-succinic acid is chemically equivalent to succinic acid, a chemical which has been in use for decades. But while succinic acid is derived from petroleum, bio-succinic acid is created from renewable resources.

11

**BioAmber's facilities**

33.51. Prior to October 2015, BioAmber produced bio-succinic acid in a small-scale demonstration facility in France. BioAmber ultimately produced less than ~~1600~~1,600 MT at this demonstration facility over its 5 years of operation ending in late 2014.

34.52. In October 2015, BioAmber began commercial-scale production of bio-succinic acid at its major facility in Sarnia ~~(the "Sarnia Facility").,~~ Canada, in a joint venture with Mitsui in which BioAmber operated the facility and held a 60% interest.

35.53. The Sarnia Facility was a significant investment, with a final price tag of approximately $141.5 million. Moreover, repeated construction delays and significant cost overruns meant production started on a sour note.

54. By December 31, 2015, Mitsui had invested at least $36.4 million towards the construction of the Sarnia Facility.

55. BioAmber also planned to build at least two additional specialty chemical production facilities. The first of these additional facilities, which BioAmber announced in January 2014 ("Facility 2") would produce 100,000 tons of 1,4-Butanediol ("BDO"), a specialty chemical constructed from bio-succinic acid. As of March 2015, BioAmber contemplated that it would complete Facility 2, and begin production, in or around early 2018.

56. The second additional facility, which BioAmber announced in July 2014 ("Facility 3"), would produce 200,000 MT of bio-succinic acid, the majority of which would be converted to BDO or another industrial chemical, THF. As of March 2015, BioAmber contemplated that it would complete Facility 3, and begin production, in or around 2020.

**The Vinmar Agreement**

57.     Vinmar International, Ltd. is a Texas-based chemicals and petroleum products broker with total revenues of $4 billion in 2012. On July 3, 2014, BioAmber entered into an agreement with Vinmar in connection with BioAmber's bio-succinic acid production (the "Vinmar Agreement"). News of the Vinmar Agreement was first disclosed in a Preliminary Prospectus Supplement filed July 15, 2014, although the actual agreement was never publicly disclosed. BioAmber did not accurately disclose all of the Vinmar Agreement's material terms to investors.

58.     BioAmber disclosed that pursuant to the Vinmar Agreement, Vinmar agreed to buy 10,000 MT of the Sarnia Facility's annual bio-succinic acid production for 15 years. BioAmber likewise disclosed that the parties had agreed to increase the scale of Facility 2 to include 70,000 MT of bio-succinic acid, which Vinmar was obligated to buy. BioAmber also disclosed that BioAmber agreed to construct Facility 3, and that Vinmar would make a 10% or greater equity investment in it. In fact, Vinmar was obligated to buy 10,000 MT of bio-succinic acid as early as 2016, since the parties anticipated that the Sarnia Facility would be completed mid-year 2015 and would take six months to ramp up to full production.

59.     BioAmber did not disclose, however, the Vinmar Agreement's severe adverse terms. First, this agreement made Vinmar BioAmber's exclusive broker in Asia (the "Exclusivity Provision"). Then and now, China accounts for approximately 95% of the worldwide market for succinic acid. Second, the Vinmar Agreement sharply limited BioAmber's ability to independently negotiate any sales even outside of Asia. Second, if BioAmber independently

13

negotiated any such sales, the Vinmar Agreement prohibited BioAmber from renewing such sales, as the customers would be turned over to Vinmar.

60.     SEC rules require that registrants disclose on Form 8-K any material definitive agreement not made in the registrant's ordinary course of business. Instructions to Form 8-K, Item 1.01(a). For any such agreement, the registrant must, among other things, describe all terms of the agreement that are material to the registrant. The Exclusivity Provision was plainly material to BioAmber, as it prohibited BioAmber's joint venture partner Mitsui from selling bio-succinic acid in Asia.

61.     FE 4 was hired in November 2014 by Huc, shortly after the Vinmar Agreement. FE 4 was thrilled by the publicly-disclosed terms of the Vinmar Agreement.

62.     A week after signing his contract, FE 4 met with Huc one-on-one in Montreal (the "Initial Meeting"). Huc explained to FE 4 at the meeting that he had personally negotiated the Vinmar Agreement with Vinmar's president, Serge Verma. Huc also told FE 4 about the Vinmar Agreement's Exclusivity Provision.

63.     FE 4 was alarmed by Huc's disclosure. Mitsui is a well-known and well-reputed Japanese conglomerate with almost $40 billion in annual sales and a world-class distribution network in Asia. Most of the world's buyers of bio-succinic acid are already customers of Mitsui. Vinmar has little experience selling specialty industrial chemicals like bio-succinic acid. It would be much easier for Mitsui to cross-sell bio-succinic acid to its existing customers than for Vinmar to try to sell bio-succinic acid to companies that are not its existing customers.

64.     Moreover, the Exclusivity Provision actually violated the Sarnia Facility joint venture agreement, filed with the SEC on February 15, 2013 as Exhibit 10-38 to a Draft Registration Statement (the "JV Agreement"). Pursuant to the JV Agreement, the Sarnia Facility

14

"shall not appoint any Person (other than a party in accordance with this Agreement) as the exclusive distributor in any geography of [bio-succinic acid]." BioAmber did not disclose that the JV Agreement had been abridged or violated.

65.     FE 4 expressed these concerns to Huc at the Initial Meeting. FE 4 told Huc at the meeting that it was "a shame" that Mitsui could not sell bio-succinic acid from the Sarnia Facility in Asia. Huc responded with general statements about Japanese business culture and Japanese businesspeople. Huc told FE 4 that "you can't trust them. They will nod up and down when they mean no. Be very careful what you tell them, and how you work with them." As Huc told FE 4, Mitsui, because it is a Japanese company, cannot be trusted. Huc continued to express these attitudes to FE 4 over the course of FE 4's employment.

66.     According to FE 4, Mitsui first learned of the Exclusivity Provision of the Vinmar Agreement well after FE 4 – that is, at least four months after the Vinmar Agreement was signed.

67.     Largely because of the Vinmar Agreement, Mitsui stopped speaking directly to Huc. FE 4 became Mitsui's intermediary to Huc. FE 4 conveyed Mitsui's positions, requests, and concerns to Huc.

68.     Mitsui had two directors on the Sarnia Facility's Board, while BioAmber had three. During FE 4's tenure, Mitsui regularly complained that the Sarnia Facility would not take actions that Mitsui thought were beneficial or advisable and essentially ignored its wishes.

69.     According to FE 4, Mitsui was aghast at the Vinmar agreement. Beginning shortly after FE 4's tenure began, Mitsui repeatedly told FE 4 that it was "very, very frustrated" by the Vinmar Agreement and conveyed that it was insulted by the Exclusivity Provision. Nonetheless, in light of its significant investment, Mitsui continued with the partnership.

70.     FE 4 primarily dealt with Mitsui employees located in New York. These employees told FE 4 that they were under considerable pressure from Mitsui's Tokyo head office. Mitsui's head office noted that the BioAmber joint venture was not meeting its objectives and expressed doubt that the joint venture would be successful. Mitsui continued to express, and indeed escalate, its concerns over the course of FE 4's tenure.

71.     Beginning shortly after FE 4's hiring, BioAmber executives began to worry about Vinmar's ability to sell the bio-succinic acid it was bound to buy. According to FE 4, "the conversation became increasingly 'We need to help Vinmar succeed. They don't know specialty chemicals.'" In fact, BioAmber placed its former Asia General Manager Mukund Rao with Vinmar to help it sell bio-succinic acid. Vinmar paid half of Rao's salary.

72.     In May or June 2015, BioAmber executives, including at least Huc, Rao, and FE 4, met with Verma in Sarnia (the "Sarnia Vinmar Meeting").

73.     At the Sarnia Vinmar Meeting, Verma told BioAmber he did not believe that Vinmar would be able to sell anywhere near its commitment. Verma blamed Mitsui. Verma falsely claimed that Mitsui had approached customers and told them *not* to buy from Vinmar. Verma's claim was not only false, but preposterous. Since Mitsui had a then-30% stake in the Sarnia Facility, it stood to lose if Vinmar did not sell any bio-succinic acid as a result of any malignant interference.

74.     At a breakfast meeting taking place either the day of or the day after the Sarnia Vinmar Meeting, Rao told FE 4 that Vinmar was not succeeding because it was not in the business of specialty chemicals.

75.     Nevertheless, following the Sarnia Vinmar Meeting, Huc held a meeting with Mitsui, and requested that Mitsui make a vigorous effort to have its customers purchase bio-succinic acid from Vinmar.

76.     Mitsui was frustrated and insulted by Huc's request. Mitsui also had little confidence that Vinmar could sell bio-succinic acid in Asia. Mitsui expressed its frustration to FE 4, who conveyed Mitsui's frustration to Huc.

77.     In or around July 2015, BioAmber held an executive team meeting in Montreal (the "July 2015 Meeting"). The entire executive team, except CTO Jim Millis, was present.

78.     During discussion of the very first item on the agenda, "Leadership Update," Huc announced that he had personally relieved Vinmar from its contractual obligation to purchase any bio-succinic acid from BioAmber during the remainder of 2015 and the entirety of 2016. FE 5 confirms that in early 2016, he was told verbally that Huc had released Vinmar from its obligations. According to FE 5, BioAmber avoided putting the information in a memo or an email, or anything "formal."

79.     At the July 2015 Meeting, Huc announced that BioAmber would not disclose publicly to investors that Huc had released Vinmar from its obligations, and in fact, BioAmber did not disclose this information.

80.     FE 4 expressed concern at the meeting that "the SEC would have a heart attack" if it discovered that BioAmber was concealing this information from investors.

81.     According to FE 4, in response, Huc "got angry." Huc said that the materially false statements were "not a problem. ***The SEC doesn't care about stuff like that. We're too small [of a company].***"

82.     During the first break in the July 2015 Meeting, FE 4 pulled BioAmber CFO Francois Laurin aside, and told him "Francois [Laurin], this is not good." Mr. Laurin shook his head and answered "no, this is not good." Laurin resigned from BioAmber on July 29, 2015, effective August 7, 2015.

83.     After the July 2015 Meeting, FE 4 spoke with Babette Pettersen about Huc's plan. According to FE 4, "[Pettersen] was equally aghast, but [said] sitting around whining about it wasn't going to do anything." Pettersen left by February 2016.

84.     Immediately before the next Board Meeting, taking place in or around early August 2015, FE 4 approached Huc and told him "You're going to tell the board, right, that Vinmar is off the table?" Huc responded "No. The board doesn't care about these kinds of details."

85.     FE 4 told Mitsui that BioAmber had released Vinmar from its obligation. Mitsui was "completely aghast" and "horrified."

86.     FE 4 was terminated in October 2015 when his position was pretextually eliminated.

87.     According to BioAmber's 2015 10-K, filed on March 15, 2016 (the "2015 10-K") 71% of BioAmber's 2016 sales were made to a single customer, PTTMCC Biochem Company Ltd. No other customer – including Vinmar – accounted for more than 10% of BioAmber's 2016 sales. Accordingly, Vinmar accounted for less than 10% of BioAmber's 2016 sales – if any.

**BioAmber's Q4 2016 Revenues Plunge**

36.88.  To mollify investors, in ~~its~~the 2015 10-K ~~filed March 15, 2016 (the "2015 10-K")~~, BioAmber announced that it expected production at the Sarnia Facility to reach full capacity of 30,000 MT/year in 2017.

37.89. Early BioAmber results – while they suggested BioAmber would have some difficulty in reaching its target – were generally supportive, with revenues rising from $1.1 million in Q4 2015 to $3.7 million in Q4Q3 2016. Yet BioAmber's substantial operating costs, research and development costs, and other costs meant profitability was still far away:

*Sales revenues, cost of goods sold, and net loss by quarter*

| Quarter | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|
| Revenues | $1.1 million | $1.5 million | $2.5 million | $3.7 million |
| Cost of Goods Sold | $1.2 million | $3.1 million | $3.5 million | $5.0 million |
| Revenues Less Cost of Goods Sold | ($0.1 million) | ($1.6 million) | ($1.0 million) | ($1.3 million) |
| Net income (loss) attributable to BioAmber shareholders | ($7.8 million) | ($10.9 million) | $4.8 million[a] | ($6.2 million) |

*Source: 2015 10-K and Q1-Q3 2016 10-Qs*

90. Moreover, the $4.8 million Q2 2016 profit was actually a paper profit resulting from an $11.9 million financing gain from revaluation of unexercised warrants because of BioAmber's relatively low share price.

38.91. Meanwhile, BioAmber's cash reserves were rapidly dwindling. BioAmber had just $7 million of cash and cash equivalents as of December 31, 2015, and $5.5 million by June 30, 2016.

---

[a] This is a paper profit resulting from an $11.9 million financing gain from revaluation of unexercised warrants because of BioAmber's relatively low share price.

39.92. In fact, in September 2016, BioAmber entered into an agreement for a demand non-revolving credit facility with Bridging Finance, Inc., and~~on extremely onerous terms. BioAmber~~ received net loan proceeds of ~~CAD~~CDN$25 million (the "Debt Facility"), after paying a 1.5% financing fee. The Debt Facility was secured by substantially all of BioAmber's assets and was repayable at the earlier of demand or September 30, 2017. The Debt Facility also bore an onerous interest rate of 10.8% *plus* the Bank of Montreal prime rate of approximately 2-3%, compounded monthly – meaning that BioAmber could expect to pay CDN$3-4 million per year of interest on the Debt Facility. BioAmber could hardly afford to pay this interest.

40.93. As of September 30, 2016, even after the infusion from the Debt Facility, BioAmber had only $16.0 million, or about nine months' worth of expenses.

94. The Debt Facility's other terms were equally onerous. The Debt Facility was secured by substantially all of BioAmber's assets, including its interest in the Sarnia Facility (the "Debt Facility Security Interest").

95. The Debt Facility's lender could demand repayment at any time. BioAmber would then owe repayment immediately.

96. Any technical default of the Debt Facility's terms would increase the interest rate to 21%.

97. Thus, BioAmber would never have entered into the Debt Facility if it had any other debt financing alternatives available.

41.98. BioAmber also was depending on the future exercise of warrants to fund its operations. In its May 2013 IPO, BioAmber had sold warrants with an exercise price of $5/share. As Huc explained in BioAmber's Q3 2016 earnings conference call, BioAmber was considering lowering the exercise price or extending the life of the warrants, for no consideration, to ensure

they were exercised and that BioAmber received the proceeds. That BioAmber was willing to consider simply giving valuable consideration to warrant-holders as a gift showed its desperation.

42.99. Thus, while BioAmber's revenue growth showed some promise, time was not on its side.

**BioAmber's fortunes take a sharp turn for the worse just as it needs to raise cash**

43.100. In Q4 2016, BioAmber's fortunes took a sharp turn for the worse.

44.101. First, a large BioAmber customer was expected to purchase $2.8 million of bio-succinic acid in Q4 2016, but due to a technical problem in the customer's manufacturing facility postponed the order to 2017.

45.102. Second, a $1.4 million order was not completed as planned in Q4 2016. On the Q1 2017 earnings call, following the Class Periodfiling of BioAmber's 2016 10-K, in response to a question from Rodman & Renshaw analyst Sameer Joshi, Michael Hartmann, BioAmber's CEO, explained that this $1.4 million related to an order which was not shipped in Q4 2016. Hartmann was referring to the CJCJ Order.

103. In early December 2016, BioAmber confirmed an order for 1,000 metric tons of bio-succinic acid to CJCJ (i.e., the CJCJ Order). FE 5 worked at the Sarnia Facility when BioAmber received the CJCJ Order.

104. According to FE 5, BioAmber shipped bio-succinic acid via shipping containers, each of which could hold no more than 20 metric tons. Accordingly, the CJCJ Order accounted for at least 50 shipping containers.

105.     Orecchionni told FE 5 that Defendant Saucier determined contemporaneously with the CJC Order that BioAmber could not recognize revenues from the CJCJ Order until CJCJ received the shipment.

106.     According to FE 5, the Company strained to complete the CJCJ Order by year's end because "management wanted to recognize the sale in 2016 fiscal year."

107.     On December 19, 2016, BioAmber issued a press release announcing it had signed a non-binding letter of intent with South Korean-based CJCJ. BioAmber and CJCJ planned to establish a joint venture in China to produce up to 36,000 metric tons of bio-succinic acid annually and to commercialize the output in Asia. The press release also disclosed that as part of the deal, "BioAmber will be selling CJCJ bio-succinic acid manufactured at its Sarnia, Ontario plant, so that CJCJ can undertake market development in China and South Korea in the first half of 2017." According to FE 5, the CJCJ Order was part of the deal announced December 19.

108.     According to FE 5 however, the shipments were not completed in December 2016. In fact, "everything got shipped between early January to mid-February."

109.     Since the CJCJ Order had not shipped to CJCJ by December 31, 2016, let alone arrived to the delivery point, BioAmber had no grounds to recognize the revenue from the CJCJ Order.

110.     FE 5's job involved keeping track of large shipments and accounts, and informing Huc and Orecchioni when a shipment had arrived.

111.     FE 5 also prepared weekly reports on the status of every shipment. These weekly reports tracked: (a) when the shipment shipped; (b) when it arrived; (c) when it was invoiced;

22

and (d) when it was paid. FE 5's weekly reports were circulated to all management, including Huc and Saucier.

112.   According to FE 5, BioAmber kept a running log of how much product had been shipped to date for each order.

113.   According to FE 5, keeping track of the shipments was critical to managing BioAmber's cash flow. In his experience, the Company's finance department needed to know when the clock had started on a shipment to help recognize key benchmarks such as when the order was shipped, when it arrived, when it was invoiced and when it was paid.

~~46.~~114.   As a result, BioAmber's _true_ Q4 2016 revenues were a mere $631,000 – an approximately 82% collapse from Q3 2016 revenues ~~$1.4 million, or 68% less than expected.~~.

~~47.~~115.   With its dire need for cash, BioAmber faced the daunting task of raising money in the face of an 82% collapse in revenues.

## Defendants' false and misleading Class Period statements

116.   ~~BioAmber's 2015 and 2016 10-Ks both state~~On July 15, 2014, BioAmber filed a Preliminary Prospectus Supplement with the SEC for the sale of 2.8 million shares in a public offering. On July 16, 2014, BioAmber filed a substantially identical final Prospectus Supplement (the "2014 Prospectus Supplements.") The 2014 Prospectus Supplements were issued pursuant to, and incorporated by reference into, a Registration Statement on Form S-3 filed June 2, 2014 and declared effective July 9, 2014, and signed by Huc. The offering that took place pursuant to the 2014 Prospectus Supplements raised $35.8 million.

117.   The 2014 Prospectus Supplements each provided:

On July 3, 2014, we signed a master product offtake agreement with Vinmar International, Ltd. having three components. The first component is Vinmar committing to purchase and BioAmber Sarnia committing to sell 10,000 metric tons of succinic acid per year produced by the 30,000 ton per year plant that is

currently under construction in Sarnia, Canada, during a 15-year period commencing upon the completion of the commissioning and start-up phase of the plant. The second component is the broadening of the scope of our previously announced 100,000 metric ton per year 1,4 BDO plant, which we currently plan to start up in late 2017, by expanding the production of this second plant to include 70,000 metric tons of bio-based succinic acid, of which Vinmar has committed to purchase and we have committed to sell a minimum of 50,000 metric tons for a period of 15 years from this second plant's start-up date. The third component involves a third plant producing 200,000 metric tons of bio-based succinic acid per year, which we currently plan to start up in late 2020, and Vinmar's commitment to purchase and our commitment to sell a minimum of 150,000 metric tons of this plant's production for a period of 15 years from this third plant's start-up date. Vinmar also has the option to secure additional bio-succinic acid tonnage under the agreement if we have not committed the remaining volume of either the second or the third plant at the time their respective financing is secured. Vinmar plans to make a 10% or greater equity investment in each of the expanded second plant and the third plant. Both Vinmar's and our obligations in connection with each of the second and third plants are subject to their respective financing, construction and commissioning. As with our January 2014 agreement with Vinmar, though this agreement is binding, our inability to finance and construct either the second or third plant would relieve Vinmar of its obligation to purchase products from that plant under the terms of this agreement.

118.    The description of the Vinmar Agreement was materially misleading because (i) it omitted the Exclusivity Provision, among other adverse terms, and (ii) it omitted that BioAmber had abridged or violated the JV Agreement.

119.    On March 16, 2015, BioAmber filed its 10-K for the year ended December 31, 2014 (the "2014 10-K"). Huc signed the 2014 10-K.

120.    The 2014 10-K provided, in relevant part:

On January 22, 2014, we entered into a 15 year take-or-pay contract for bio-based 1,4-Butanediol (BDO) with Vinmar, a privately held marketing, distribution, and project developed company headquartered in Houston, Texas. Under the terms of the master off-take agreement, Vinmar has committed to purchase 100% of the bio-based 1,4 BDO produced in a 100,000 metric ton per year capacity plant that we plan to build in North America and commission in 2018. Vinmar also plans to invest in the facility alongside us. While this agreement is binding, our inability to finance and construct the BDO plant would relieve Vinmar of its obligation to purchase BDO under the terms of the take-or-pay agreement. We signed a second take-or-pay agreement on July 3, 2014 with Vinmar to supply 10,000 tons of bio-succinic acid per year for 15 years from the Sarnia plant. The take-or-pay

agreement also includes an expansion to the BDO facility previously announced of an additional 70,000 tons per year of bio-succinic acid, with Vinmar off-taking 70% of the bio-succinic acid produced for 15 years. Vinmar also commits to off-take 75% of the production from a new, third bio-succinic acid plant with 200,000 MT capacity that BioAmber plans to commission in 2020.

121.     The 2014 10-K also provided:

We currently sell directly to our customers and commercial partners *as well as indirectly through Mitsui and other distributors*. Mitsui is assisting us in selling bio-succinic acid and pre-marketing bio-based 1,4 BDO. Mitsui is one of the world's largest general trading companies, with a broad presence in the global chemicals market. Mitsui provides know-how regarding shipping and logistics, warehousing, credit checks, freight insurance, and trade finance that facilitate sales in Asia, *and brings additional credibility to our customers in Asia*.

122.     These statements were materially false and misleading because (i) they omitted the Exclusivity Provision, among other adverse terms, (ii) they omitted that BioAmber had abridged or violated the JV Agreement, and (iii) they omitted that Mitsui would not be permitted to distribute the Sarnia Facility's bio-succinic acid production in Asia.

123.     On April 30, 2015, BioAmber filed a Preliminary Prospectus Supplement with the SEC for the sale of shares in a public offering. On May 4, 2015, BioAmber filed a substantially identical final Prospectus Supplement for the sale of 3.8 million shares (the "2015 Prospectus Supplements.") The 2015 Prospectus Supplements were issued pursuant to, and incorporated by reference into, a Registration Statement on Form S-3 filed June 2, 2014 and declared effective July 9, 2014, and signed by Huc. The offering that took place pursuant to the 2015 Prospectus Supplements raised $35.1 million.

124.     The 2015 Prospectus Supplements provided:

We signed a second take-or-pay agreement on July 3, 2014 with Vinmar to supply 10,000 tons of bio-succinic acid per year for 15 years from the Sarnia plant. The take-or-pay agreement also includes an expansion to the BDO facility previously announced of an additional 70,000 tons per year of bio-succinic acid, with Vinmar off-taking 67% of the bio-succinic acid produced for 15 years. Vinmar also commited to off-take 75% of the production from a new, third bio-succinic acid

plant with 200,000 MT of annual capacity that BioAmber plans to commission in 2020.

125.    The description of the Vinmar Agreement was materially misleading because (i) it omitted the Exclusivity Provision, among other adverse terms, and (ii) it omitted that BioAmber had abridged or violated the JV Agreement.

126.    On August 5, 2015, BioAmber filed its 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). Huc signed the Q2 2015 10-Q.

127.    The Q2 2015 10-Q provided that:

***We signed a second take-or-pay agreement in July 2014 with Vinmar to supply 10,000 MT of bio-succinic acid per year for 15 years from the Sarnia plant.*** The take-or-pay agreement also includes an expansion to the BDO facility previously announced of an additional 70,000 MT per year of bio-succinic acid, with Vinmar off-taking 67% of the bio-succinic acid produced for 15 years. Vinmar also commits to off-take 75% of the production from a new, third bio-succinic acid plant with 200,000 MT capacity that BioAmber plans to commission in 2020.

128.    The description of the Vinmar Agreement was materially misleading because (i) it omitted the Exclusivity Provision, among other adverse terms, (ii) it omitted that BioAmber had abridged or violated the JV Agreement, and (iii) it omitted that BioAmber had released Vinmar of its obligations under the Vinmar Agreement for 2015 and 2016.

129.    On November 9, 2015, BioAmber filed its 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). Huc signed the Q3 2015 10-Q.

130.    The Q3 2015 10-Q provided that:

***We signed a second take-or-pay agreement in July 2014 with Vinmar to supply 10,000 MT of bio-succinic acid per year for 15 years from the Sarnia plant.*** The take-or-pay agreement also includes an expansion to the BDO facility previously announced of an additional 70,000 MT per year of bio-succinic acid, with Vinmar off-taking 67% of the bio-succinic acid produced for 15 years. Vinmar also commits to off-take 75% of the production from a new, third bio-succinic acid plant with 200,000 MT capacity that BioAmber plans to commission in 2020.

131.    The description of the Vinmar Agreement was materially misleading because (i) it omitted the Exclusivity Provision, among other adverse terms, (ii) it omitted that BioAmber had abridged or violated the JV Agreement, and (iii) it omitted that BioAmber had released Vinmar of its obligations under the Vinmar Agreement for 2015 and 2016.

132.    On January 14, 2016, BioAmber filed a Preliminary Prospectus Supplement with the SEC for the sale of shares in a public offering. On January 19, 2016, BioAmber filed a substantially identical final Prospectus Supplement for the sale of 2.6 million shares (the "January 2016 Prospectus Supplements.") The January 2016 Prospectus Supplements were issued pursuant to, and incorporated by reference into, a Registration Statement on Form S-3 filed June 2, 2014 and declared effective July 9, 2014, and signed by Huc. The offering that took place pursuant to the January 2016 Prospectus Supplements raised $11.8 million.

133.    On February 8, 2016, BioAmber entered into a binding term sheet with Mitsui (the "Term Sheet"). Pursuant to the Term Sheet, Mitsui (i) installed a Chief Commercial Officer for the Sarnia Facility, (ii) received primary responsibility for commercialization of bio-succinic acid from the Sarnia Facility, (iii) received an additional director of the Sarnia Facility, leaving each of BioAmber and Mitsui with three directors, and (iv) increased its interest in the Sarnia Facility to 40%. In exchange, Mitsui agreed to make an additional capital contribution of $18.0 million.

134.    On March 15, 2016, BioAmber filed its 10-K for the year ended December 31, 2015 (the "2015 10-K"). Huc signed the 2015 10-K.

135.    The 2015 10-K provided, in relevant part:

*We signed a second take-or-pay agreement on July 3, 2014 with Vinmar to supply 10,000 tons of bio-succinic acid per year for 15 years from the Sarnia plant.* The take-or-pay agreement also includes an expansion to the BDO facility previously announced of an additional 70,000 tons per year of bio-succinic acid,

with Vinmar off-taking 70% of the bio-succinic acid produced for 15 years. Vinmar also commits to off-take 75% of the production from a new, third bio-succinic acid plant with 200,000 MT capacity that BioAmber plans to commission in 2020.

136.    The description of the Vinmar Agreement was materially misleading because (i) it omitted the Exclusivity Provision, among other adverse terms, (ii) it omitted that BioAmber had abridged or violated the JV Agreement, and (iii) it omitted that BioAmber had released Vinmar of its obligations under the Vinmar Agreement for 2015 and 2016.

**The December 2016 and January 2017 False Statements**

48.137.    The 2015 10-K states that BioAmber's revenue recognition policy is that "[r]evenue is recognized when persuasive evidence of an arrangement exists, the fee is determinable, collectability is reasonably assured ***and delivery has occurred***, which for product revenue is at the time of transfer of title" (emphasis added).

49.138.    Similarly, Generally Accepted Accounting Principles ("GAAP") provide that revenues can only be recognized when the buyer takes title at delivery. FASB Concepts Statement 5, paragraph 84(a), (b), and (d).

139.    As of December 22, 2016, BioAmber had approximately $10 million in cash. For fiscal years 2014 and 2015, BioAmber had negative cash flow (i.e., it had been burning through cash) at the rate of over $30.0 million per year.  Thus, as of December 22, 2016, BioAmber had less than six months of cash on hand.

50.140.    On December 23, 2016, the CompanyBioAmber announced an underwritten offering of approximately 1.7 million shares of its common stock at $4.00 per share, with gross proceeds approximately $7 million and net proceeds to BioAmber of approximately $5.6 million. –The Company also announced a registered direct offering to "permitted investors" in Canada of warrants to purchase a total of approximately 2.2 million

28

shares of common stock, anticipating gross proceeds of approximately $8.9 million[4] (together with the stock offering, the "December Offering").  The warrants would be automatically exercised for no consideration if BioAmber obtained a listing on the Toronto Stock Exchange on or before 120 days after the date of issuance of the warrants. If BioAmber did not obtain a listing, the proceeds would revert to warrant purchasers.

51.141.    The December Offering was made by the Company pursuant to a shelf registration statement on Form S-3 that was previously filed with the SEC, a related registration statement on Form S-3MEF which became effective upon filing with the SEC on December 22, 2016 (the "2016 Registration Statement"), and two Prospectus Supplements filed with the SEC on December 23, 2016 (the "December Prospectus Supplements").  The 2016 Registration Statement was signed by Defendants Huc and Saucier, and incorporated by reference the December Prospectus Supplements.[5]

142.    The 2016 Registration Statement "incorporates by reference the contents of, including all amendments and exhibits thereto and all information incorporated by reference therein, the Registration Statement on Form S-3 (Registration No. 333-196470) (the 'Prior Registration Statement'), which was declared effective by the Commission on July 9, 2014."

---

[4]  The warrants would be automatically exercised for no consideration if BioAmber obtained a listing on the Toronto Stock Exchange on or before 120 days after the date of issuance of the warrants. If BioAmber did not obtain a listing, the proceeds would revert to warrant purchasers.

[5]  The 2016 Registration Statement "incorporates by reference the contents of, including all amendments and exhibits thereto and all information incorporated by reference therein, the Registration Statement on Form S-3 (Registration No. 333-196470) (the 'Prior Registration Statement'), which was declared effective by the Commission on July 9, 2014."  The Prior Registration Statement in turn incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated."  Thus the December Prospectus Supplements are incorporated by reference into the 2016 Registration Statement.

The Prior Registration Statement in turn incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated."

143.    Thus the December Prospectus Supplements are incorporated by reference into the 2016 Registration Statement.

52.144.    The December Prospectus Supplements each contained the following statements regarding the Company's operating results:

**Recent Operating Results (Preliminary and Unaudited)**

*For the three months and year ended December 31, 2016, we expect total revenues to be between $2.0 million and $2.2 million, and $9.6 million and $9.8 million, respectively*, as compared to total revenues of $1.1 million and $2.2 million for the three months and year ended December 31, 2015, and $3.7 million for the three months ended September 30, 2016.

[…]

Our consolidated financial statements for the three months and year ended December 31, 2016 are not yet available. The foregoing information reflects our estimate with respect to total revenues based on currently available information, which is preliminary and unaudited, is not a comprehensive statement of our financial results and is subject to completion of our financial closing procedures. While *we have not identified any unusual or unique events or trends that occurred during the period that might materially affect this preliminary estimate*, our actual results for the three months and year ended December 31, 2016 will not be available until after this offering is completed, may differ materially from our preliminary estimate and are not indicative of the results to be expected for any future period. We have provided a preliminary range, rather than a specific amount, for total revenues primarily because our financial closing procedures for the three months and year ended December 31, 2016 are not yet complete and, as a result, our final results upon completion of our closing procedures may vary from the preliminary estimate.

145.    On December 21, 2016, BioAmber entered into an agreement to waive the Debt Facility Security Interest in exchange for, among other things, a CDN$375,000 payment.

BioAmber was also required to maintain a cash balance of the lesser of CDN$15.0 million or the outstanding balance under the credit facility. BioAmber had until February 7, 2017 to put in place the restricted cash. Yet as of December 21, 2016, BioAmber only had approximately $9 million in cash, or about CDN$12 million. Thus, if BioAmber did not conduct an offering by February 2017, it would be in default on the Debt Facility.

146. Finally, in the December Prospectus Supplements, Defendants represented that:

On December 22, 2016, we also entered into an amendment to our Master Product Offtake Agreement for Bio-Succinic Acid with Vinmar, in connection with our Sarnia facility and two future bio-succinic acid facilities. The amendment terminated the portion of the offtake agreement related to our Sarnia facility in connection with entering into our non-binding letter of intent with CJCJ, pursuant to which such termination is a requirement of the definitive agreements contemplated by the non-binding letter of intent. In addition, our joint venture partner Mitsui & Co. has taken a more active role in the commercialization of bio-succinic acid in Asia following the amendment of our joint venture agreement with Mitsui in the spring of 2016. Mitsui has informed us, and we believe, that the continuation of the Vinmar arrangement has resulted in channel conflict and presented difficulty for Mitsui to develop the market for bio-succinic acid in Asia in parallel with Vinmar's efforts. We believe that such channel conflict would be exacerbated as CJCJ begins to sell bio-succinic acid in China and Korea as part of its pre-marketing efforts for our proposed China joint venture.

147. Defendants' statements were false and misleading because: (a) there was no "channel conflict" between Mitsui and Vinmar, because Vinmar had been released of its obligations by July 2015; (b) the "channel conflict" would not be exacerbated if CJCJ began to sell bio-succinic acid in China and Korea, because Vinmar had been released of its obligations by July 2015; (c) the real reason that BioAmber had entered into the amended agreement was that Huc had terminated Vinmar's obligations under its take-or-pay contract in July 2015.

53.148. On January 23, 2017, the Company commenced another offering (the "January Offering") for the sale of approximately 2.1 million shares of its common stock at $4.75 per share, together with warrants to purchase a minimum of 1,052,632 shares of common

stock of the Company with an exercise price of ~~US~~$5.50 per share of common stock, with expected gross proceeds to the Company of $10 million (assuming no exercise of the warrants).

~~54.~~149.        On January 24, 2017, the Company announced an increase of the January Offering to $17.5 million.

~~55.~~150.        The January Offering was made by the Company pursuant to a shelf registration statement on Form S-3 that was filed with the SEC on January 3, 2017, and declared effective by the SEC on January 12, 2017 (the "January Registration Statement"), as well as Prospectus Supplements filed on January 23, 2017 and January 24, 2017 (the "January Prospectus Supplements"). The January Registration Statement was signed by Defendants Huc and Saucier, and incorporated by reference the January Prospectus Supplements.[6] The January Registration Statement incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated."

~~56.~~151.        The January Prospectus Supplements stated the following with regards to the Company's operating results:

**Recent Operating Results (Preliminary and Unaudited)**

***For the three months and year ended December 31, 2016, we expect total revenues to be between $2.0 million and $2.2 million, and $9.6 million and $9.8 million***, respectively, as compared to total revenues of $1.1 million and $2.2 million for the three months and year ended December 31, 2015, and $3.7 million for the three months ended September 30, 2016.

---

[6] ~~The January Registration Statement incorporates by reference "all documents … that are filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act … (ii) after the date of this prospectus until we sell all of the shares covered by this prospectus or the sale of shares by us pursuant to this prospectus is terminated."~~

[…]

Our consolidated financial statements for the three months and year ended December 31, 2016 are not yet available. The foregoing information reflects our estimate with respect to total revenues based on currently available information, which is preliminary and unaudited, is not a comprehensive statement of our financial results and is subject to completion of our financial closing procedures. While *we have not identified any unusual or unique events or trends that occurred during the period that might materially affect this preliminary estimate*, our actual results for the three months and year ended December 31, 2016 will not be available until after this offering is completed, may differ materially from our preliminary estimate and are not indicative of the results to be expected for any future period. We have provided a preliminary range, rather than a specific amount, for total revenues primarily because our financial closing procedures for the three months and year ended December 31, 2016 are not yet complete and, as a result, our final results upon completion of our closing procedures may vary from the preliminary estimate.

152.    On January 27, 2017, the underwriters for the January Offering exercised their option to purchase an additional 552,632 shares of BioAmber common stock, for additional gross proceeds of $2.6 million.

~~57.~~153.    The statements contained in ~~¶¶52 & 56~~¶¶144 & 151 were materially false and misleading because: (a) they overstated BioAmber's Q4 2016 revenues by nearly 70~~%. Because~~%, in that BioAmber's true Q4 2016 revenues were only $0.6 million; (b) they omitted to disclose that the $1.4 million ~~order~~CJCJ Order had not shipped, and pursuant to ~~its~~BioAmber's revenue recognition policy ~~and,~~ GAAP, and Defendant Saucier's own determination, BioAmber could not recognize revenues from the ~~$1.4 million order in Q4 2016.~~CJCJ Order in Q4 2016; (c) as a result, Defendants had identified, but failed to disclose, an event that materially affected the estimate. Accordingly, BioAmber's Q4 2016 revenues were not $2.0-2.2 million, but $0.6 million~~.~~

~~Subsequent developments~~

~~58.~~154.    On January 27, 2017, using the proceeds from the December and January Offerings, BioAmber retired the Debt Facility.

33

59.155.     In a February 17, 2017 public announcement, BioAmber claimed that its Board of Directors and Defendant Huc "mutually agreed that Mr. Huc would cease serving in his roles as Chief Executive Officer and President of the Company", ," effective immediately. ~~Huc was replaced by an Acting CEO, and BioAmber then began a search for a permanent CEO.~~

156.    Huc was richly compensated for leaving the company. Huc's termination agreement provided him a retiring allowance of $491,000. Huc also received a bonus payment for the 2017 year of 70% of his annual salary, or $352,000, though he had only worked slightly more than a month in 2017. Pursuant to BioAmber's executive compensation plan, Huc should only have been eligible for annual bonuses of up to *60%* of his salary even had he served all of 2017.

157.    Thus, in total, Huc received a payoff of $843,000 or 170% of his annual salary. In addition, the termination agreement provided for the immediate vesting of all of Huc's stock options. The termination also provided Huc with a lucrative non-exclusive contract for consulting services with BioAmber, entitling him to $20,000 per month for 5 days of work per month for six months – or $4,000 per day. Huc was also compensated for accrued vacation pay.

158.    Huc was replaced by an Acting CEO, and BioAmber then began a search for a permanent CEO.

**Loss causation**

159.    On March 16, 2017, the Company issued a press release after close of trading announcing disappointing financial results for the 2016 fiscal year, noting that "[o]ur fourth quarter 2016 product sales of approximately $631,000 were below our previously disclosed fourth quarter expectations of $2.0 to $2.2 million. We expected that additional revenue of

approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017 and was classified as a deferred revenue as of December 31, 2016."

160.    The same day, the Company filed its 2016 10-K, stating that "Our sales for the three months ended December 31, 2016 of approximately $631,000 were below our expectations. We expected that additional revenue of approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017, and recorded as deferred revenue on our consolidated balance sheets as of December 31, 2016."

161.    On this news, shares of BioAmber fell $0.59 per share, or over 18%, from their previous closing price on unusually high volume to close at $2.55 per share on March 17, 2017, damaging investors.

162.    Analysts were surprised by the news:

a.    A March 17, 2017 report by an analyst employed by AltaCorp Capital commented that "Q4 product sales of $0.6 million were much lower than our expectations of $2.1 million."   Notably, AltaCorp had underwritten the January Offering. On August 8, 2017, AltaCorp issued a report formally withdrawing its price target and stating that its coverage was under review. It has not issued further reports.

b.    A March 17, 2017 report by an analyst employed by Rodman & Renshaw commented that "[r]evenues came in lower than expected." Rodman & Renshaw underwrote the December Offerings. Rodman & Renshaw has not issued a report since May 10, 2017.

c.    Barclays discontinued coverage of BioAmber in an April 21, 2017 report that cited the revenue shortfall and the associated material deficiency in internal controls.

d. Canaccord Genuity similarly discontinued coverage on March 17, 2017, the day after BioAmber announced its Q4 2016 results.

60.163. In a March 28, 2017 public announcement, BioAmber claimed that its Board of Directors and Saucier "mutually agreed that Mr. Saucier would cease serving in his role as Chief Financial Officer of the Company"." effective immediately. Saucier was replaced by an Acting CFO, and BioAmber then began a search for a permanent CFO.

61. On August 1, 2017, BioAmber purchased Mitsui's interest in the Sarnia Facility for $1.

164. Pursuant to the terms of the JV Agreement, Mitsui had the right, in its sole discretion, to have BioAmber repurchase Mitsui's interest for 50% of the capital contribution, or about CDN$33 million ($26.3 million). Yet on August 3, 2017, BioAmber announced, among other things, that it had purchased Mitsui's interest in the Sarnia Facility for CDN$1. The key consideration was BioAmber's agreement to indemnify Mitsui for any payment Mitsui was required to make in respect of any loans made to the Sarnia Facility which Mitsui had guaranteed.

165. The markets reacted to Mitsui's vote of non-confidence. On August 4, 2017, BioAmber's stock price fell $0.72 per share from their previous close, or 32%, on high volume. The next trading day, they fell a further $0.53 per share to close at $0.99 per share, again on high volume. In total, BioAmber's shares lost 56% of their value in two days.

**Additional facts further probative of scienter**

62.166. Further facts, in addition to those set out above, show that the statements were made with scienter.

63.167.　　　As of December 31, 2016, BioAmber had only 86 full-time employees, of whom only 17 were engaged in general and administrative activities. Accordingly, only a few BioAmber employees were involved in revenue recognition.

64.168.　　　According to FE 1, in his experience, the role of a CFO at BioAmber "was the ultimate accounting officer. Obviously, decisions or recommendations were discussed among the senior management team."　FE 1 stated that the CFO of the Company would certainly be involved with all major revenue recognition decisions, with input from the CEO.　Defendant Huc was CEO at the time FE 1 served as CFO and at the time BioAmber released its supplemental prospectuses in connection with the offerings.

65.169.　　　FE 1 reportedstated that a delay of a major shipment would definitely be reported to the CEO and other senior executives at the Company.

66.170.　　　According to FE 32, Huc and other top executives were intimately involved in day-to-day operations, as well as making accounting decisions. "We were a small company, so of course they went up to him," FE 32 said.　And, according to FE 32, Huc worked very closely with then-COO Fabrice Orecchioni on day-to-day operational issues.

67.171.　　　Indeed, according to FE 43, a "very close circle" of senior management participated in senior-level discussion and were responsible for all major discussion.

68.172.　　　And according to FE 32, BioAmber was "meticulous" about documenting client communications and issues. According to FE 32, because BioAmber documented every client interaction, "I know we knew if something was going to be delayed."

69.　　　BioAmber's average sales price of bio succinic acid hovered around $2,000 per metric ton.　In a press release dated March 14, 2016, the Company described its average selling price in reference to a "$2,000 / MT guidance."　During an earnings call on November 3, 2016,

an analyst asked, "in terms of the bio-succinic acid sale price, is $2,000 per tonne [metric ton] fair?" Huc responded, "We have not seen a material change in our average selling price in 2016 year to date. And so we're not giving any change relative to past guidance." And on an earnings call taking place August 3, 2016, an analyst again asked whether BioAmber's average selling price continued to be $2,000/MT; BioAmber's acting CEO answered that BioAmber's average selling price had continued to remain steady.[7]

70.173. Based on this average selling price, a $1.4 million order for bio-succinic acid would weigh approximately 700 MT. In the U.S., a tractor trailer rig cannot weigh more than 31 metric tons, meaning that the 700 MT would account for more than 23 tractor trailer loads. Moreover, given that 1 MT of bio-succinic acid occupies 55.1 cubic feet of space, 700 MT of bio-succinic acid would occupy a volume of approximately 15,821 cubic feet. And bioBio-succinic acid is a hazardous corrosive substance that causes serious eye damage, is harmful if it touches the skin, requires gloves and facial protection for handling, and requires special precautions in shipping such as not reusing containers. Shipping this massive quantity of a hazardous product was no small feat and required significant oversight, planning, personnel and time to arrange, especially at a small company like BioAmber. Moreover, the $1.4 million shipment represented 70% of the Company's expected revenues for the entire quarter, at a time when the Company was trying hard to ramp up production and sales in order to offset significant capital expenditures. BioAmber's upper management was necessarily involved with the shipment and updated on any developments or delays. Accordingly, BioAmber's senior management, including the Individual Defendants, knew that the shipment was delayed.

---

[7] FE 2 also noted that BioAmber's average selling price was approximately $1/pound, or $2,200/MT.

71.174.    BioAmber has admitted that its premature recognition of the $1.4 million in revenue resulted from a material weakness in its internal controls, stating in its 2016 10-K that:[8]

Formatted: Right:  0.5"

In connection with the preparation of our year ended December 31, 2016 consolidated financial statements, we identified a material weakness in internal control over financial reporting, that if not corrected, could result in a material misstatement in our financial statements. ***The material weakness is related to accounting for non-routine or complex transactions, which resulted in an error in the accounting treatment in a complex revenue recognition transaction and in an inadequate financial statements disclosure.*** Our review process for the accounting treatment for non-routine or complex transactions allowed these errors to go undetected, and management has assessed the potential magnitude and concluded that this represents a material weakness in our internal control over financial reporting[.]

Formatted: Font color: Black

(emphasis added).

175.    BioAmber's Q3 2016 10-Q did not report this material weakness in internal controls, meaning that the material weakness arose in the fourth quarter of 2016.

**Loss causation**

72.1.    On March 16, 2017, the Company issued a press release after close of trading announcing disappointing financial results for the 2016 fiscal year, noting that "[o]ur fourth quarter 2016 product sales of approximately $631,000 were below our previously disclosed fourth quarter expectations of $2.0 to $2.2 million. We expected that additional revenue of approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017 and was classified as a deferred revenue as of December 31, 2016."

73.160.    The same day, the Company filed its 2016 10-K, stating that "Our sales for the three months ended December 31, 2016 of approximately $631,000 were below our

---

[8] BioAmber's Q3 2016 10-Q did not report this material weakness in internal controls, meaning that the material weakness arose in the fourth quarter of 2016.

expectations. We expected that additional revenue of approximately $1.4 million would be recorded in the quarter but it had to be deferred until 2017, and recorded as deferred revenue on our consolidated balance sheets as of December 31, 2016."

74.161. On this news, shares of BioAmber fell $0.59 per share, or over 18%, from their previous closing price on unusually high volume to close at $2.55 per share on March 17, 2017, damaging investors.

75.162. Analysts were surprised by the news:

a. A March 17, 2017 report by an analyst employed by AltaCorp Capital commented that "Q4 product sales of $0.6 million were much lower than our expectations of $2.1 million."

b. A March 17, 2017 report by an analyst employed by Rodman & Renshaw commented that "[r]evenues came in lower than expected."

c. Barclays discontinued coverage of BioAmber in an April 21, 2017 report that cited the revenue shortfall and the associated material deficiency in internal controls.

d. Canaccord Genuity similarly discontinued coverage on March 17, 2017, the day after BioAmber announced its Q4 2016 results.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

76.176. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired BioAmber securities publicly traded during the Class Period and/or pursuant and/or traceable to the Offerings, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the

40

Company, members of the Individual ~~Defendants'~~Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

~~77.~~177.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BioAmber securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

~~78.~~178.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by ~~Defendants'~~Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~79.~~179.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

~~80.~~180.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the Exchange Act was violated by ~~Defendants'~~Defendants' acts as alleged herein;

b.  whether statements made by Defendants to the investing public misrepresented material facts about the Company's financial condition and business;

c. whether ~~Defendants'~~Defendants' public statements to the investing public omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Defendants caused the Company to issue false and misleading SEC filings;

e. whether Defendants acted knowingly or recklessly in issuing false and SEC filing;

f. whether the prices of BioAmber securities were artificially inflated because of the ~~Defendants'~~Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

~~81.~~181.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

~~82.~~182.    In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market theory, because BioAmber's common stock traded in an efficient market during the Class Period, as follows:

a. Throughout the Class Period, BioAmber's common stock shares met the requirements for listing, and were listed and actively traded on the NYSE, a

highly efficient and automated market, throughout the Class Period. BioAmber shares were highly liquid during the Class Period;

b.      As a regulated issuer, BioAmber filed periodic public reports with the SEC and the NYSE;

c.      The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.      The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of BioAmber's shares;

e.      BioAmber's securities were covered by at least ~~4~~6 securities analysts employed by major brokerage firms who wrote reports about the Company during the Class Period, including AltaCorp Capital, Barclays, Rodman & Renshaw, Cowens & Co., Societe Generale, and Canaccord Genuity, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f.      On average, approximately ~~1.3 million~~417,000 BioAmber shares, or ~~3.8% of BioAmber's total shares outstanding and 5.2~~.3% of its float, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

g.      As an NYSE-traded stock, BioAmber had a designated market maker which made a market in BioAmber's shares.

h. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of BioAmber's shares.

~~83.~~183. Based on the foregoing, the market for BioAmber securities promptly digested current information regarding BioAmber from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

~~84.~~184. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

~~85.~~185. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

~~86.~~186. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

~~87.~~187. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44

88.188.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BioAmber securities during the Class Period.

89.189.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.190.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiffs and the Class.

45

91.191.    As a result of the foregoing, the market price of BioAmber securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of BioAmber securities during the Class Period in purchasing BioAmber securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92.192.    Had Plaintiffs and the other members of the Class been aware that the market price of BioAmber securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased BioAmber securities at the artificially inflated prices that they did, or at all.

93.193.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

94.194.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of BioAmber securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

95.195.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.196.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and

46

indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

~~97.~~197.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

~~98.~~198.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BioAmber securities.

~~99.~~199.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: ~~August 7~~December 5, 2017                    Respectfully Submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Jonathan Horne
Jonathan Horne, Esq. (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
          lrosen@rosenlegal.com
          pkim@rosenlegal.com

**GOLDBERG LAW PC**
Michael Goldberg, Esq.
1999 Avenue of the Stars
Suite 1100
Los Angeles CA 90067
Phone: 1800-977-7401
Fax: 1800-536-0065

*Co-Lead Counsel for Lead Plaintiff*

48

**CERTIFICATE OF SERVICE**

I hereby certify that on ~~August 7~~December 5, 2017, I electronically filed the foregoing document, which sent notification of such filing to all counsel of record.

/s/ Jonathan Horne